UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
VICTOR WILLIAMS,　　　　　　　　　　　　　　　　**COMPLAINT**

　　　　　　　　　　　　　　　　　　　　　　　　**20 cv 3039**

　　　　　　　　　　　　　　　　　　　　　　　　**ECF Case**
　　　　　　　　　　　　Plaintiff,
　　　　v.

CITY OF NEW YORK,
NEW YORK CITY POLICE OFFICERS
RUBEN ALVAREZ,
JOHN BRENNAN,　　　　　　　　　　　　　　　　**JURY TRIAL DEMANDED**
in their individual and official capacities,

　　　　　　　　　　　　Defendants.
---------------------------------------------------------------x

Plaintiff Victor Williams, by his attorney, Cyrus Joubin, complaining of the Defendants, respectfully alleges as follows:

## PRELIMINARY STATEMENT

1. This action arises from various civil rights violations against Victor Williams ("Plaintiff") by New York City police officers. Plaintiff asserts constitutional claims pursuant to 42 U.S.C. § 1983 ("Section 1983") against the individual defendants for false arrest, excessive force, denial of the right to a fair trial, failure to intervene, and a *Monell* claim against the City of New York for the same constitutional violations. Additionally, Plaintiff asserts analogous claims under New York Law against the individual defendants, and against the City of New York under the doctrine of *respondeat superior*. Plaintiff seeks compensatory and punitive damages, costs, disbursements, and attorney's fees pursuant to applicable state and federal civil rights law.

## JURISDICTION

2. This action is brought pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 and the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1343 (a)(3) and (a)(4), this being an action seeking redress for the violation of Plaintiff's constitutional and civil rights.

3. Plaintiff further invokes this Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over any and all state law claims and causes of action which derive from the same nucleus of operative facts and are part of the same case or controversy which gives rise to the federally based claims and causes of action.

## VENUE

4. Venue is proper in the United States District Court for the Eastern District of New York pursuant to 28 U.S.C. § 1391(b) because the acts complained of occurred in this district.

## JURY DEMAND

5. Plaintiff respectfully demands a trial by jury on each and every one of his claims as pled herein, pursuant to Fed. R. Civ. P. 38(b).

## PARTIES

6. Plaintiff is an African-American transgender man.

7. The individually named defendants Police Officer Ruben Alvarez (Shield # 16060) ("PO Alvarez") and Police Officer John Brennan (Shield # 24668) ("PO Brennan") (collectively, the "individual defendants") are and were at all times relevant

herein officers, employees and agents of the New York City Police Department ("NYPD").

8. Upon information and belief, on the date of the incident giving rise to this complaint, the individual defendants were assigned to the NYPD 83rd Precinct.

9. Each individual defendant is sued in his individual and official capacity. At all times mentioned herein, each individual defendant acted under the color of state law, in the capacity of an officer, employee, and agent of defendant City of New York ("Defendant City").

10. Defendant City is a municipality created and authorized under the laws of New York State. It is authorized by law to maintain, direct, and to supervise the NYPD, which acts as its law enforcement agent and for which it is ultimately responsible.

## NOTICE OF CLAIM

11. Plaintiff served a Notice of Claim on the Comptroller of the City of New York within ninety days of the incident, being assigned Claim # 2019PI029434. At least 30 days have elapsed since the service of the Notice of Claim, and adjustment and payment has been neglected or refused.

12. The City of New York demanded a hearing pursuant to General Municipal Law § 50-h, which hearing was held on February 19, 2020.

13. This action has been commenced within one year and ninety days after the occurrence of the event upon which the claims are based.

## STATEMENT OF FACTS

**AN ARGUMENT WITH HIS GIRLFRIEND**

14. On August 28, 2019, Plaintiff was with his girlfriend (Brianna McIlwain) in his apartment, located at 157 North Elliot Walk (Apartment 4E) in Brooklyn, New York.

15. That evening Plaintiff and Brianna had an argument in the apartment.

16. When the argument escalated to the point that Brianna was yelling and throwing things in the apartment, Plaintiff called the police so they could remove Brianna from his apartment.

**A VIOLENT ARREST**

17. PO Alvarez and PO Brennan arrived at the apartment around 8:15 p.m.

18. PO Alvarez and PO Brennan were in NYPD uniforms and wearing body worn cameras.

19. After Plaintiff opened his apartment door for the officers, the officers entered, found Brianna in the bathroom, and began to escort Brianna out of the apartment.

20. While the officers were preparing to escort Brianna out of the apartment, PO Brennan made condescending comments toward Plaintiff in an increasingly loud voice, using what sounded like racial slurs and other unprofessional remarks.

21. Plaintiff said the officer's comments were inappropriate and told the officers it was time for them to leave his apartment.

22. Officer Brennan continued yelling as he left Plaintiff's apartment, ranting about how Plaintiff couldn't control his girlfriend.

23. Now that the officers and his girlfriend had left his apartment, Plaintiff closed the door on them.

24. Although Plaintiff had done nothing unlawful or suspicious, the officers did not appreciate how Plaintiff closed the door on them.

25. Before Plaintiff could shut and lock his apartment door, the officers violently pushed it back on him.

26. After the officers pushed the door back open, Plaintiff fell to the ground and began feeling blows around his body, as the officers violently struck him and yelled at him.

27. Plaintiff was dragged out of his apartment and slammed onto the hallway floor.

28. Plaintiff was powerless on the floor, and in no way resisted or showed any aggression toward the officers.

29. Plaintiff's neighbors gathered in the hallway and asked the officers to get off Plaintiff, indicating that Plaintiff was not moving.

30. The officers kept Plaintiff pinned to the ground, forcefully and violently holding his head down to the ground.

31. Plaintiff pleaded with the officers to stop hurting him; he informed them he was a transgender man who, not long ago, had surgery.

32. Additional NYPD officers came to the hallway where Plaintiff was handcuffed behind his back.

33. The excessively tight handcuffs ripped into Plaintiff's flesh, causing scarring and numbness.

34. Plaintiff complained about the tight handcuffs, but the officers did nothing to alleviate the pain.

35. The defendant officers, scornful of Plaintiff's transgender identity, mocked him for crying "like a girl."

36. Because Plaintiff was in so much pain and bleeding, he asked for medical attention, and was transported to an ambulance.

37. The ambulance took him, in handcuffs, to Interfaith Medical Center in Brooklyn.

38. Because of his violent arrest, Plaintiff felt great pain in his head, face, legs, arms, and wrists, experiencing swelling and cuts as well as headaches and blurred vision.

39. After receiving some treatment to his cuts at the hospital, Plaintiff was transported to the precinct where PO Alvarez and PO Brennan worked.

40. At the precinct, Plaintiff was fingerprinted and photographed, searched and processed, booked and detained in a holding cell.

41. At the precinct, knowing of their violent and unconstitutional conduct, and trying to justify it, PO Alvarez and PO Brennan fabricated a fake narrative of Plaintiff's behavior.

42. While Plaintiff had acted innocently, the officers forwarded a fake story of Plaintiff's criminal conduct to the Brooklyn District Attorney's Office.

43. This fake story would serve as the basis for Plaintiff's criminal prosecution.

**FALSE AND FABRICATED CHARGES**

44. After being transported to Central Booking in downtown Brooklyn, Plaintiff was arraigned in Kings County Criminal Court, prosecuted under Docket CR-032124-19KN.

45. Plaintiff was charged with the crime of Resisting Arrest (NY Penal Law Section 205.30) (a class "A" misdemeanor punishable up to 1 year in jail) and the violation of Harassment in the Second Degree (PL 240.26(1)).

46. The Criminal Court complaint, signed under oath by PO Alvarez on August 29, 2019, was based on the fabricated allegations by PO Alvarez and PO Brennan.

47. Specifically, according to complaint, Plaintiff "spit on" PO Brennan – twice in two locations – and "resist[ed] lawful arrest by flailing [his] arms preventing [PO Brennan] from placing [PO Brennan's] handcuffs on [Plaintiff]."

48. In fact, Plaintiff never spit on any of the officers and never resisted arrest.

49. The judge at Plaintiff's arraignment released Plaintiff on his own recognizance but ordered him to appear in criminal court on a future date; if Plaintiff did not appear, a warrant would be issued for his arrest.

50. Plaintiff had spent about a day in custody before his release.

51. After three appearances in criminal court, Plaintiff resolved his prosecution in December 2019 by accepting an Adjournment in Contemplation of Dismissal ("ACD"); his case was dismissed six months later.

**DELIBERATE ACTS UNDER COLOR OF STATE LAW**

52. All of the aforementioned acts of the individual defendants, their agents, servants and employees, were carried out under the color of state law in the course and scope of their duties.

53. All of the aforementioned acts deprived Plaintiff of the rights guaranteed to citizens of the United States by the Fourth, Fifth, and Fourteenth Amendments of the Constitution of the United States of America, and in violation of 42 U.S.C. § 1983.

54. The individual defendants acted willfully, knowingly, and with the specific intent to deprive Plaintiff of his constitutional rights secured by 42 U.S.C. § 1983, and by the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution.

**FAILURE TO TRAIN AND SUPERVISE**

55. Upon information and belief, the individual defendants' aforementioned abuse of power – in the forms of physical violence and mendacity – was not an isolated event. There were other instances of misconduct by the individual defendants that Defendant City knew or should have known about.

56. The NYPD failed to supervise and discipline the individual defendants despite their histories of malicious and mendacious behavior, ignoring the risk that they would engage in future misconduct, thereby encouraging them to continue to abuse their powers and violate the rights of civilians.

**NYPD'S CULTURE OF MENDACITY**

57. There is a systemic failure by the City to identify, discipline, and supervise NYPD officers who fabricate criminal charges, a failure so widespread, obvious, and tolerated as to constitute a custom and policy of Defendant City.

58. The NYPD's flaccid response to lying officers – particularly in the context of filing false charges – constitutes a destructive custom and policy that fosters a culture of mendacity in the NYPD.

59. The City has recognized the obvious and significant problem of police officers fabricating criminal charges, but there is no serious mechanism in place by which to curb such conduct or weed out dishonest officers.

60. Proportionate and appropriate discipline sends a message to NYPD officers that they are not above the law and are accountable to the people whom they serve.

61. But NYPD officers usually face only minor discipline or no discipline whatsoever for making false statement on court documents.

62. The Civilian Complaint Review Board ("CCRB") has no jurisdiction to investigate allegations of fabricated statements by NYPD officers in criminal court documents. Investigating, controlling, and punishing this type of wrongdoing is the responsibility of the NYPD.

**THE NYPD'S SHAM FALSE STATEMENT POLICY**

63. In 1995, by Executive Order No. 18, Defendant City's Mayor created the Commission to Combat Police Corruption (the "Commission") to monitor and evaluate the NYPD's anti-corruption activities. The Commission fulfills its mandate to monitor the NYPD's performance by reviewing the investigations of the Internal Affairs Bureau ("IAB"), and presenting its findings in its Annual Report.

64. Since its inception, the Commission has emphasized the importance of appropriately disciplining officers who make false statements. On the basis of the Commission's recommendations, the NYPD has adopted a False Statement Policy (*see* NYPD Patrol Guide Section 203-08) that mandates termination of officers who intentionally make false official statements regarding a material matter, unless exceptional circumstances exist.

65. As the Commission stated in its 2013 Annual Report, "Consistent application of the false statement policy is of utmost importance. It not only enables members of the service to know what they can expect if they make false statements, but it also sends a clear message to members of the service, as well as the public, that the Department will not tolerate such conduct" (pg. 74).

66. The Commission analyzes false statements in official criminal court documents, including supporting depositions, criminal court complaints, summonses, and

affidavits. False statements in such documents are of paramount importance because they have the potential to unjustly deprive persons of their civil liberties and to destroy the lives of innocent people.

67. Despite the importance of appropriately identifying and punishing officers who make false statements, the NYPD rarely imposes discipline consistent with its stated policy of terminating officers.

68. Indeed, the gap between its practice and policy is so wide as to make the NYPD's False Statement Policy a sham.

69. For example, in the 2014 Annual Report, the Commission examined ten cases involving false statements in sworn court documents; in seven of those cases, the subject officers were found guilty by making false statements but not separated from the police department.

70. Such findings – which expose the gap between the NYPD's False Statement Policy and practice – can be found in virtually every Annual Report issued by the Commission.

71. Over the past ten years, in its Annual Reports, the Commission has analyzed numerous forms of false statements and has consistently found that the NYPD "fail[s] to follow its false statement policy"; "fail[s] to charge the subject officer with making a false statement although such a charge appear[s] appropriate"; levies "other similar charges…to avoid the imposition of the False Statement Policy's requirement of termination"; and creatively, and without justification, skirts the requirement of termination.

72. And there is no sign of improvement. Indeed, under Mayor de Blasio's

administration, the NYPD seems more empowered than ever to thumb its nose at the False Statement Policy.

73. In its 2015 Report, the Commission found that the NYPD rarely brought charges under the False Statement provision. "Instead," the Commission reports, "the Department used other Patrol Guide sections to allege misconduct relating to false statements" (pg. 103) – sections which do not carry a presumption of termination.

74. The Commission's 2017 Report found that the NYPD has been charging officers with making false official statements in far fewer instances than facts and circumstances seem to warrant.

75. In the specific context of fabricated court documents that falsely accuse people of wrongdoing, the Commission has regularly found grossly inadequate punishments, resulting in guilty officers forfeiting vacation days (usually no more than 30 days) but rarely losing their jobs.

76. To make matters worse, the instances of false statements investigated by the IAB and analyzed by the Commission compose a small fraction of the total instances of false statements that occur within the NYPD.

77. In the 2010 Annual Report, for instance, the Commission identified only ten IAB cases that included allegations of making an official false statement.

78. The officers who were caught fabricating statements were unlucky – they were captured on videotape, a civilian reported them, their lies were unwittingly exposed – but most dishonest police officers know they can lie and get away with it.

**"TESTILYING"**

79. On March 18, 2018, the New York Times published an article by Joseph

Goldstein called "'Testilying' by Police: A Stubborn Problem," detailing the pervasive and largely ignored problem of police perjury. "Behind closed doors, we call it testilying," said NYPD officer Pedro Martinez in an interview for the article.

80. The article states: "An investigation by the New York Times found that on more than 25 occasions since January 2015, judges or prosecutors determined that a key aspect of New York City police officer's testimony was probably untrue. The Times identified these cases – many of which are sealed – through interviews with lawyers, police officers and current and former judges." Moreover, "[t]he 25 cases identified by The Times are almost certainly only a fraction of those in which officers have come under suspicion for lying in the past three years." "Still, the cases identified by The Times reveal an entrenched perjury problem several decades in the making that shows little sign of fading." The purpose of the perjury was "aimed at tilting the scales toward guilt."

**NYPD PROTECTS AND PROMOTES LYING OFFICERS**

81. On March 19, 2018, the New York Times published another article by Joseph Goldstein entitled "Promotions, Not Punishments, for Officers Accused of Lying," reiterating the findings of the Commission and detailing a "culture of dishonesty."

82. The article states: "Of the 81 cases in which a civilian review board [the CCRB] found an officer had lied, the Police Department pursued 'false statement' charges in only two." In the other 79 cases, the NYPD found no wrongdoing or found the officer guilty of lesser misconduct.

83. The article also notes a problem with transparency and accountability when it comes to the NYPD's false statement policy: the NYPD is not required to tell the CCRB

if it takes action against lying police officers. Thus, while the CCRB is aware of the 81 cases it has tracked since 2010, it – along with the public at large – is oblivious to the total number of cases in which officers have been found to lie and what their punishments are.

84. So while the NYPD may publicly extol its professionalism and integrity control, the NYPD cannot be trusted. Its indifference to truthfulness by its own rank and file – coupled with a lack of full transparency about how it handles lying officers – makes the department as a whole unworthy of trust.

**FAILURE BY THE CITY TO FIX THE CULTURE OF MENDACITY**

85. Defendant City has turned a blind eye to the tens of thousands of criminal cases which are dismissed each year in the Criminal and Supreme Courts of Defendant City; has failed to study how many of those dismissals were due to baseless, fabricated charges; and has failed to proactively look for patterns of fabrication and identify charges that should have never been brought.

86. Defendant City has no system by which to proactively identify mendacious officers.

87. In response to the "Testilying" phenomenon, for example, the City has failed to create any system for how prosecutors should document and keep track of internal evaluations of officer dishonesty. *See* "When Prosecutors Bury NYPD Officers' Lies" (*Gothamist)*, by George Joseph and Ali Winston (Sept. 17, 2019) ("Interviews with more than a dozen former prosecutors from Brooklyn, the Bronx, Queens, Staten Island, and Manhattan DA's offices, disclosure letters from the Manhattan DA's office, and a review of numerous cases suggests internal systems to track police misconduct are haphazard at

best, and intentionally negligent at worst.").

88. In the ten years prior to July 14, 2018, the number of NYPD investigations into police officers making false statements on criminal court accusatory instruments that did not arise from civilian complaints was *zero*.

89. In a criminal justice system where numbers and statistics have become paramount, the inadequacy of the NYPD's supervision and discipline with respect to dishonesty in the filing of criminal charges is exacerbated by the pressure on police officers to meet arrest quotas, or "performance goals."

90. Because arrests are rewarded, while making false arrests and fabricating charges go largely unpunished, police officers have felt incentivized to engage in false arrests and to fabricate criminal charges.

91. Such perverse incentives become particularly destructive in the hands of dishonest, undisciplined, unsupervised officers, such as the individual defendants.

92. Through the data cited herein along with hundreds of civil rights lawsuits alleging fabrication every year, the policymakers of Defendant City have been aware of the NYPD's practice of insufficiently punishing – and thereby encouraging – the fabrication of criminal charges.

93. By doing nothing about this practice, the City has demonstrated deliberate indifference to the rights of its residents.

94. The notion of police officers lying, cheating, fabricating, manipulating, and misleading has become so accepted and commonplace within the NYPD that the pursuit of justice has become subverted and degraded. Police officers must operate in a police culture so truth-sick and cynical that their morale and morality are crushed. NYPD

officers see firsthand how roguish and dishonest behavior is rewarded within their ranks. The negative incentives created by this sick culture threaten the safety, welfare, and liberty of every resident.

**DAMAGES**

95. As a direct and proximate cause of the said acts of the Defendants, Plaintiff suffered the following injuries and damages:

   a. Violation of his constitutional rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution;
   b. Physical injury;
   c. Severe emotional trauma, distress, degradation, and suffering.

**SECTION 1983 CLAIMS**

**FIRST CLAIM**

**Denial of the Right to a Fair Trial Under Section 1983**

96. Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

97. By the actions described, the Defendants deprived Plaintiff of his Fourth, Fifth, and Fourteenth Amendment rights to a fair trial.

98. The individual defendants deliberately forwarded fabricated information to the Brooklyn District Attorney's Office.

99. As a direct and proximate result of the aforementioned conduct of the individual defendants, Plaintiff sustained the damages and injuries hereinbefore alleged.

**SECOND CLAIM**

**Excessive Force Under Section 1983**

100.   Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

101.   By the actions described, the individual defendants deprived Plaintiff of his Fourth Amendment right to be free of unreasonable or unwarranted restraints on personal liberty, specifically his right to be free from excessive and unreasonable force.

102.   As a direct and proximate result of the aforementioned conduct of the individual defendants, Plaintiff sustained the damages and injuries hereinbefore alleged.

**THIRD CLAIM**

**False Arrest Under Section 1983**

103.   Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

104.   Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

105.   By the actions described above, Defendants deprived Plaintiff of his federal civil rights, including his Fourth Amendment right to be secure in his person against unreasonable searches and seizures, specifically his right to be free from false arrest.

106.   As detailed above, the individual defendants intentionally arrested and detained Plaintiff without probable cause, without a warrant, without privilege or consent.

107.   As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages and injuries hereinbefore alleged.

**FOURTH CLAIM**

**Failure to Intervene Under Section 1983**

108. Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

109. Each and every individual defendant had an affirmative duty to intervene on Plaintiff's behalf to prevent the violation of his constitutional rights by other law enforcement officers.

110. The individual defendants failed to intervene on Plaintiff's behalf to prevent, end, or truthfully report the violations of his constitutional rights despite knowing about such violations and having had a realistic opportunity to do so.

111. As a direct and proximate result of the aforementioned conduct of the individual defendants, Plaintiff sustained the damages and injuries hereinbefore alleged.

## FIFTH CLAIM

### Municipal Liability Under Section 1983

112. Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

113. By the actions described, the Defendant City deprived Plaintiff of his Constitutional rights through its failure to train, supervise, and discipline malicious and mendacious officers; through its indifference to a culture of dishonesty among those who wield considerable power over the lives of everyday citizens; and through its tolerance of illegal body cavity searches by NYPD officers.

114. As a direct and proximate result of the acts of Defendant City, Plaintiff sustained the other damages and injuries hereinbefore alleged.

## PENDENT STATE CLAIMS

### FIRST CLAIM

### False Imprisonment under N.Y. State Law

115. Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

116. The individual defendants intentionally arrested and detained Plaintiff without probable cause, without a warrant, and without privilege or consent.

117. As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages and injuries hereinbefore alleged.

### SECOND CLAIM

### Battery Under N.Y. State Law

118. Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

119. As detailed above, the individual defendants intentionally touched Plaintiff in an offensive and harmful manner, and they intentionally subjected him to offensive and harmful contact.

120. As a direct and proximate result, Plaintiff sustained the damages and injuries hereinbefore alleged.

### THIRD CLAIM

### Intentional Infliction of Emotional Distress Under N.Y. State Law

121. Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

122. As detailed above, the individual defendants committed an extreme and outrageous act toward Plaintiff, intending to cause him severe emotional distress and causing such distress through their actions.

123. As a direct and proximate result, Plaintiff sustained the damages and injuries hereinbefore alleged.

## FOURTH CLAIM

**Negligent Hiring/Training/Retention of Employment Services Under N.Y. State Law (Against Defendant City of New York)**

124. Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

125. Defendant City owed a duty of care to Plaintiff to prevent the false arrest, battery, fabrication of evidence, and mental and emotional abuse sustained by Plaintiff.

126. Upon information and belief, all of the individual defendants were unfit and incompetent for their positions.

127. Defendant City knew or should have known through the exercise of reasonable diligence that the individual defendants could potentially cause harm.

128. Defendant City's negligence in hiring, screening, training, disciplining and retaining the individual defendants proximately caused Plaintiff's injuries.

129. As a result of its negligent conduct, Defendant City has directly and proximately caused the damages and injuries hereinbefore alleged.

## FIFTH CLAIM

**Respondeat Superior Under N.Y. State Law**

130. Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

131. Defendant City is the employer of the individual defendants.

132. Under the doctrine of *respondeat superior*, the Defendant City is responsible for the wrongdoing of its employees acting within the scope of their employment – in this

case, the false imprisonment, battery, intentional infliction of emotional distress, and fabrication committed by the individual defendants against Plaintiff.

133. As a direct and proximate result of the acts of the individual defendants detailed above, Plaintiff sustained the damages and injuries hereinbefore alleged.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands the following relief jointly and severally against the Defendants:

    a. An order awarding compensatory damages for Plaintiff Victor Williams in an amount to be determined at trial;

    b. An order awarding punitive damages in an amount to be determined at trial;

    c. A court order, pursuant to 42 U.S.C. § 1988, that Plaintiff is entitled to reasonable attorney's fees, costs and disbursements; and

    d. Such other and further relief as this Court may deem appropriate.

DATED: July 8, 2020                    /s/
New York, New York       CYRUS JOUBIN, ESQ.
43 West 43rd Street, Suite 119
New York, NY 10036
(703) 851-2467
joubinlaw@gmail.com
Attorney for Victor Williams